May it please the court. Joseph Daly for the plaintiff's appellants. Your honors, I'm going to reserve three minutes for rebuttal. Your honors, this appeal presents a stark picture of when pre-suit demand upon a board of directors would have been absolutely futile. Allegan's board engaged in a decade's worth of improper and illegal actions revolving around the off-label marketing of therapeutic Botox, leading to numerous lawsuits, government investigations, $600 million in fines and penalties, and a criminal guilty plea. Now, demand futility and reasonable doubt are at the heart of this appeal. Under Delaware demand futility law, pre-suit demand is excused when plaintiffs raise simply a reasonable doubt as to whether, number one, the challenged acts were the products of the board's valid exercises of business judgment, or two, whether a majority of the board is disinterested and independent. Here, I would like to concentrate on the valid exercise of business judgment prong because I feel the facts really fit that paradigm very nicely. And the district court's errors, both legal and factual, in rejecting that prong were so obvious. And that is whether this court applies an abuse of discretion review or, as we've suggested in our briefing, a de novo review. Now, it's well settled that there's no business judgment protection for illegal conduct. And the illegal conduct here was the off-label marketing of Botox therapeutic, a decade-plus endeavor that we know the board started with the 1997-2001 strategic plan. It's there in black and white, Your Honors. Tab C of our brief shows the board's strategic plan excerpt. The board intended to, quote, maximize sales, end quote, of Botox for two decidedly off-label uses, spasticity and migraine headache, whose FDA approval would not come in even a slight form for another ten years. And the board was not talking about future plans to perhaps introduce this into the market five or six years down the road. Tab B explains that they wanted to maximize those, quote, immediate opportunities. And so through the ensuing years, the board continued to implement this and other off-label strategies. For example, in 2003, the headache development program, when seven of the 12 defendant directors were on the board, the board materials show that the board tracked the prevalence of migraine and headaches around the country and deliberately sought out doctors that were treating those afflictions. At the time, though, Allergan's clinical trials were a dismal failure. Nine out of ten clinical trials failed. And the board materials show that of that headache development program, there was a core team, a core team of four team members, and one of those four team members was a member of Allergan's Global Strategic Marketing Division. In the same year, in 2003, the CDHA, the cervical dystonia, which is a fancy term for somebody who has a twisted neck and can't get it back into position, the CDHA, headache initiative, then nine and then eventually ten of the 12 directors were on the board. The board materials show that the initiative was designed to encourage more cervical dystonia diagnosis for just pain and headache symptoms. But at the time, Your Honors, there were only 27,000 people in the United States among 300 million citizens suffering from that disease. And yet in January 2005, defendant and CEO and board member David Piott reports to the board of strong Botox sales resulting from our CD pain initiative. That is a clear link between the board's deliberate actions and the result in sales. Yes, Judge Merguia? Let's just back up a little bit. Is there any material difference between a conscious decision to ignore red flags, I'm just trying to determine how we evaluate this evidence that you're pointing us to, a difference between a conscious decision to ignore red flags of illegal conduct and a failure to exercise oversight despite red flags of illegal conduct? There is. And the second of the two examples you give is the famous, or as I would call it, the infamous Caremark decision. That is not this case at all. That is a case in which the board is perhaps completely oblivious to what has gone on. And the reason that they are oblivious is perhaps they have not put into place reasonable oversight actions. The first example you gave is one of the examples given under the Aronson case where the board's business judgment can be attacked either through a conscious decision or a conscious decision not to act. And I suggest here we have the conscious decision to act. I mean, it's just all over the fact pattern in this case. Judge Reinhart, you asked earlier, one of counsel up here, let's just get to the facts. I mean, the facts here scream out affirmative overt board actions directed at this illegal and marketing of Botox therapeutic. Moving on beyond 2000. Well, does that mean you're saying that we should just disregard the Caremark standard and say it's got to be either a conscious decision not to act or the other side wins? I don't think you disregard the Caremark decision. I mean, I realize they spent 10 pages of their briefing discussing Caremark, but... I understand your principal argument is that you don't have to go down to that level, that they don't meet the standard of making a decision not to act. You're saying you are alleging that they actually made a decision. But I'm also saying the... But are you also saying that if you don't succeed in that, that it does meet the failing to exercise oversight in face of red flags, or are you just throwing that one away? No. Of course it meets that as well, but it's a continuum. It's the first, the second, and the third. You're speaking of the third. I'm saying if you don't accept my argument and the allegations in the complaint showing what we feel are overt affirmative actions, you still at least get to the second prong of Aronson, which is a conscious decision not to act. In other words, throughout the years with the warning letters from the FDA, with the board being told of the Dr. Shim incident, eight incidents in one year where this doctor on Allergan's payroll goes out and is illegally touting the effects of Botox for migraine. At the very least, you do get the board's conscious decision not to act upon that, not to shut down the CDHA initiative, which is directed at doctors around the United States. Now, we know these efforts by the board work because no less than the U.S. government has said they work. According to the U.S. government, between 1999 and 2006, the off-label headache sales of Botox alone grew by 1,400 percent. The off-label sales for pain grew by 500 percent. The off-label sales for spasticity grew by 300 percent. Not one of them were on-label at the time, and it was no less than the Department of Justice that looked at the board's 2007-2011 strategic plan. All right? That's a plan authored by the board. That's a plan being waved around at a board meeting, 12 people discussing it. The Department of Justice said that provided, quote, the clearest connection between growing sales personnel and off-label sales growth. I guess, I mean, I think this kind of goes to how you view the facts here, but couldn't that be characterized as just the board's monitoring of markets it's interested in, perhaps expanding into in the future? I mean, does that suggest a decision by the board to Number one, it could be, but it doesn't matter if it could be received that way because that's an inference in the defendant's favor. This was the motion to dismiss stage. We get the benefit of all reasonable inferences, not them. And number two, the board knew, for example, just so far as migraine and headache pain, they knew that Allergan had already failed nine of ten clinical trials. There was nothing on the immediate horizon. There was nothing on the horizon for three or four years down the road. It wouldn't happen for another 10 or 12 years. And that is some of the errors that the district court here committed. It committed both legal errors and clearly erroneous legal findings. It demanded actual evidence of the board's off-label decision. It wanted to see the board throw around terms in the board meeting notes like off-label marketing, as in weird, boy, isn't that off-label marketing? I don't know if we should be doing that. You're not going to This exponential growth in off-label sales, it doesn't just happen serendipitously. It's a result of the board going out and soliciting these doctors around the country, getting them to, and by the way, let's not forget the fact that therapeutic Botox was a buy-and-bill drug. That is, the doctors had a vested interest in writing prescriptions for this because they would buy the drug from Allergan at $400 or $500 a vial. I forget the price. They would turn around and prescribe it for their patients, perhaps off-label, but it was up to them to go back and justify that prescription to the insurance company or to Medicaid or Medicare. So they had a vested interest in, they made more money by buying this from Allergan and then being able to write these prescriptions. I mean, there's no other logical explanation for what happened, and the Department of Justice certainly thought so. You know, to the tune of $600 million, the Department of Justice and the states that sued between de novo review and abusive discretion, are you saying you rely on de novo review to win here? No. Okay. So you're saying abusive discretion. What's in the... No, no, no. I'm sorry. I misspoke. What I'm saying is we win under either, but please. Right. Abusive discretion. Let's focus, because we're looking at the district court's decision. Yes. What findings do you, I guess, are the most... Egregious? Egregious in your view? I'm sorry. I didn't mean to interject that. No, that's fine. The district court looked at all these factors, and as I said earlier, he took inferences in the defendant's favor. That's a legal error, but factual error. For example, he concluded the 2003 headache program, quote, had absolutely nothing to do with marketing, end quote, Botox. And that's in his order at excerpt of record seven. Meaning that when Judge Carter made that statement, he was overlooking or perhaps disbelieving allegations that at that point, Allergan had already failed nine out of ten clinical trials having to do with headache. That meant that he overlooked or disbelieved the allegation that the board had in front of it when it put that 2003 headache program into place, had in front of it a slide showing that the headache initiative of the four core team members, here are the four people that are going to go around the country and help us ostensibly legally promote this drug, is a member of their marketing team. You just can't do that. That's bedrock FDA and pharmaceutical practice. You cannot go out and do that. I see that I'm dipping right into my rebuttal time, if your honors don't mind. Could I ask you a question? Please do, Judge Noonan. The $600 million fine, was that paid to the government? It was actually, the $600 million was divided into two, it was fines and criminal penalties. I believe $275 million of it went to various states for their, who had been forced to reimburse doctors for this off-label Botox, and the other portion of it, the $300 plus million, went to the United States government as part of Allergan's criminal plea, criminal guilty plea. But both of them were paid by the company, is that correct? I'm sorry, you said both payments were made by the company? Yes. Yes, that's correct. Thank you. Thank you. May it please the Court, Mark Perry for the directors of Allergan. Mr. Perry, before you start, may I ask you about your 28-K letter of May 28th? Certainly. You are familiar with 28-K, are you not? Certainly. The 28-K, which allows you to cite supplemental authorities that come to your attention after the brief has been filed, where you must set forth the citations, do you consider the Wall Street Journal a supplemental authority under Rule 28-K? We did, Your Honor. We understand the Court has stricken it, therefore we don't rely on it in any way. If you would like to explain. No, I know you don't rely on it, you tried to rely on it. Certainly, Your Honor. But you consider the Wall Street Journal a supplemental authority? Your Honor, I do. If you'd like me to explain why, I'd be happy to. Yes, please. Thank you. Plaintiffs in this case, the shareholders who seek to bring this suit on behalf of Allergan, have advanced a theory in which off-label sales are unlawful when the real law is that off-label marketing are unlawful. And part of their theory is a deliberate confusion, Your Honor, about the word indications and what it means to secure FDA approval for new indications. And they fail to recognize that throughout these documents, they reflect that the Board, the strategic correction for the company, was to expand Botox sales by securing new indications. And in fact, those things have happened. This morning, my friend Mr. Daly said twice, it wasn't until 2010 that the headache was approved. That's true for chronic migraine. But at the time, the Board understood and expected and projected that it would be approved in 2001. The FDA moved slower than sometimes we expect. The point of the Wall Street Journal article that we thought was helpful to put these things in context was to show that these indications have, in fact, been proven. Suppose this had been a Rush Limbaugh editorial, which you transcribed from the radio. Would that be an appropriate citation to a legal authority? Well, Your Honor, of course. Each would have to be – depends on the context of the case and what the issue was. Rush Limbaugh hasn't commented on these. And what isn't a legal authority with a citation to – I'm trying to find out what your view is of legal authorities that you can submit. Anything that happens that you find anywhere? Your Honor, we were of the view that the Wall Street Journal's explanation of the historical approvals of new indications for Botox, all factual information that is recited in this record and was summarized in that chart, would be helpful to the Court. If the Court doesn't find it helpful, of course, the Court – No, I'm not asking whether we find it helpful. I just wonder under what theory you or your firm decides what may be cited to the Court right before argument. And your theory is anything you find in a magazine, a newspaper article, a statement made by anybody? Absolutely, Your Honor. It was a – it was a specific, researched editorial piece in light of new indications for Botox with a chronological history of the very events that are at issue in this case that show that the inferences that the plaintiff wishes to draw are wrong. If the Court doesn't wish to look at it, that's fine. But if it is – You don't have to tell me we don't have to look at it. We've already decided that. And whether you approve of it or not is not the question. The question is whether we approve of your performance in telling us what we may consider. All right. I understand your argument, and I will expect in the future from you to receive anything right before argument that you think might influence the Court, whether it's in a case or anything else, such as a statement by the head of the company. Whatever you want to send us right before oral argument, wherever you find it, you can send it to us. And we'll see what we think is appropriate. Maybe we have to do something to make Rule 28J clearer to you. Your Honor, I sincerely apologize for any liberty. All right. We'll get to your argument, then. Speaking of inferences, can you respond to the argument made by Mr. Daley and then, I guess, also by the Chancery of Delaware Court that the district court here made, instead of making plaintiff-friendly inferences, made defendant-friendly inferences? Yes, Your Honor. Contrary to the law. So first, Your Honor, the presumption of business judgment applies, and the plaintiff has to overcome it by reasonable inferences. The Delaware Supreme Court has said that over and over again. So it's not a question of plaintiff-friendly or defendant-friendly. It is what is reasonable in light of all the circumstances. Second, what Judge Carter did here was recognize that the snippets that these shareholders have taken out of the documents aren't consistent with the actual documents themselves. And when you read the actual documents, they say the opposite of the inferences that these shareholders have asked the court to draw from them. And Judge Carter recognized that. Judge Laster, Vice Chancellor Laster, did not. And there's a simple explanation for that. Judge Laster didn't have all the documents, whereas Judge Carter did. We submitted them to Judge Carter. And when he looked at them, it was clear. Let's look at the 1997 plan, which my friend relies on most heavily. He cites it 34 times in his briefs. Now, Your Honor, a majority of the directors did not approve the 1997 plan. So it's irrelevant to demand futility. Let's start with that. That's in the complaint, paragraph 7. But even there, the 1997 plan, he said this morning, quote, it says immediate opportunities for Botox. That's not what the page says. It's the page supplemental to the excerpt of record, page 21. It says we have immediate opportunities for our core business, which is eye care, contact lens solution, and so forth. And while putting in place the technological platforms on which we can build our business in these other areas, which is Botox, and specifically the new indications for spasticity and migraine. The plan then goes on to explain in great detail that they will invest hundreds of millions of dollars in clinical studies to get these new indications. And my friend, Mr. Daly, also said it's not some future plan. The plan itself says, quote, it's all part of, quote, strategic planning for the, quote, future, including, quote, data and approvals for currently under-approved uses. That's page 97 of the supplemental record. But doesn't the plan say it's not dependent on FDA approval for the new uses? And wouldn't that be a reasonable inference? It does not, Your Honor. In fact, what it says is the headaches, for example. It's at page SER24. The estimated launch year for headaches is 2001. If you then look at SER4, which my friend didn't give the court, it says that the estimated FDA approval is also 2001. In every instance, the planned growth in the new indications is the same year as the company, as the board was being advised that the FDA approval would be secured. They match up word for word, and it's just a point-by-point comparison of SER4 and SER24. We've made this point over and over again. Mr. Daly's never responded to it. The plan goes through over and over again. Invest and grow in new indications, 4. New indications, 6. New indications, 22. New indications, 28. New indications, such as migraine, 33. This is a plan that was premised on FDA approvals. That's what the board approved. There are two things I think are important to be clear, Your Honor, or undisputed in this case. One, the board of directors of Allergan issued a strategic directive to maximize sales of Botox. That's the quote my friend Mr. Daly loves. It's absolutely true. This was the leading product of the company. Their fiduciary duty is to maximize shareholder value by maximizing lawfully the sales of that product. They had policies and procedures in place that are pleaded in the complaint that said off-label marketing is unlawful and you shall not do it. Point two that's undisputed. The government, after a full investigation, found that certain low-level employees in Allergan stepped over the line and engaged in off-label marketing and the company paid a fine and a civil penalty for that. Let's talk about the, you know, it seems like the board knew that Allergan started a cervical dystonia headache initiative to ensure continued, I think the word is, or continued expansion into the headache market. And director defendant Piott made a presentation to the board on the strong Botox sales that resulted from this initiative. That's an excellent point, Your Honor. Cervical dystonia is an on-label use. This is an approved use of Botox. And what the CDHA initiative was about a doctor education campaign fully consistent with the First Amendment and the FDA guidelines to talk to them about when it was appropriate to both diagnose cervical dystonia and prescribe for it. That does not in any way have to do with off-label marketing. It is an on-label use and every CD prescription is an on-label prescription. The headache piece of that, Your Honor, there's a little bit of confusion here. There were ongoing studies throughout the 2000s. Again, the initial estimation was 2001 approval. It took longer than expected because there were some inconsistencies in the data. And what turned out, and this is all borne out, by the way, in those headache slides that Mr. Daly referred to the headache program. They're actually in the record at page 153 to 164 of the supplemental excerpts. What they showed is that the data were inconclusive as to periodic migraines, but quite helpful for chronic migraines. And so as the data mounted, the FDA application changed and the FDA ultimately approved the product for chronic migraines because, in fact, the data showed that that was a useful support. All of this was happening, Your Honor, in an iterative process between the medical community and the company. These doctors are ethically permitted and, in fact, obligated to prescribe things for off-label uses if they wish. And these doctors were discovering new uses for this product and reporting it back. Once enough critical mass forms, the company would spend, again, hundreds of millions of dollars on these clinical studies. It's extremely expensive to secure FDA approval to make these uses on-label. But there's no prohibition on the off-label sales as the medical community experiments. And Mr. Daly said, you know, does it just serendipitously happen? No. What happens is the doctors talk to each other. The doctors who are out there are the front-line treating physicians. They discover these things and they talk to each other. The company is not permitted to promote. However, the company is permitted to circulate information and respond to questions. This is a very delicate and, you know. So you have the 1997-2001 strategic plan. You have the headache program, which you're offering your inference or what could be and should be read from what happened there. And then we have several letters from the FDA warning them about promotion issues with Botox and one warning allergen that a doctor is shim. Shim. Shims, allergen-sponsored off-label presentations of Botox for headaches. So here's another item. I mean, there's others, but what do we do with that? And then the combination, does that make any reasonable inference difference for the plaintiffs? The FDA letters have nothing, other than Dr. Shim, which I will talk about, had nothing to do with Botox therapeutic. They said, for example, that one of your advertisements suggests that the protein content of Botox cosmetic has an unproven benefit. That has nothing to do with the issues in this case or the government settlement or anything else. It was on a totally different subject, and it was addressed in a totally different course. The Dr. Shim incident proves our point. Here is the one instance in this entire record. And remember, the government did a full investigation, interviews and documents, and these plaintiffs got a section 220 production of all the board materials. In all of the information in the entire 15-year history that's at issue, we have one incident in which off-label marketing is reported as such to the board. And it is the Shim incident. It's a letter from the general counsel that appears in our supplemental excerpts of record at page 165. And it says, we have learned that a doctor has gone off program, used unapproved slides, and we are taking the following actions. We're transferring the managers. We're reorganizing the marketing department. We are beefing up our compliance programs. We are issuing new policies. The board was told that its own policies, which prohibit off-label marketing, were not being followed by this one doctor, and they fixed the problem. A culture of compliance, as the government put it in the sentencing memorandum, followed that. It is not to say that one doctor going off script shows that the board had directed this entire program for which it is. And let's remember that this is a derivative case, Your Honor. The shareholders who are before you are asking the court to take away from the board of directors elected by all shareholders the decision whether it is issued and give it to them. They have to show not that the company was the perpetrator, but that it was the victim of misconduct. And Judge McGee, I'd like to go to your question about the standard, because I think Mr. Daly misstated it. The standard is this, and I'm quoting from the Delaware Supreme Court's decision in Wood v. Baum. They must plead particularized facts that demonstrate that the directors acted with scienter. That is, that they had actual or constructive knowledge that their conduct was legally improper. That is not simple. That is not easy. That is a very high standard because, as the Delaware Supreme Court has also told us, it exists to preserve the primacy of board decision making. This is not a shareholder direct case against the corporation. The corporation has been judged guilty and settled. But even after that big government investigation and the settlement, it's important to note it's a strict liability offense. There was no finding of intent by the U.S. Attorney or the Justice Department, no plea of guilty to an intentional wrongdoing. This is a complicated area. And not one director was named as having been implicated or even having knowledge of the plan. Your Honor, the directors set the strategic direction of the company. They don't get involved in marketing. I'd like to point to you. You have about 15 seconds left. Do you want to take a little couple of sentences to summarize? Your Honor, the summary is this. When the documents are read, they don't show any approval of unlawful marketing. The only place marketing is mentioned in this plan is in the PS&M section. It's at page 28. And they show that marketing was an expense. The directors knew that. The directors never approved what the company did. This was executed, implemented tactically by lower-level people. What the plaintiffs here have totally failed to do was to meet the high hurdle imposed by the Delaware Supreme Court to show that these directors, with scienter, engaged in an intentional breach of their fiduciary duty. That's the standard here. They waived the Caremark Claim. So they have to show an intentional breach of fiduciary duty. They have a full document production already. They want to read the documents out of context, misread the documents out of context, and misapply the legal standards. Judge Carter got it right. Thank you, Your Honor. Thank you, counsel. Just four quick points on rebuttal, Your Honors. Number one, the idea that the prospective FDA approvals for these things were happening 2001, 2003, 2004. The Department of Justice says in the record, in Supplemental Excerpt of Record, which they submitted, Supplemental Excerpt of Record 266, Note 6, Allergan was constantly moving those target dates back in time. They knew they were nowhere close to it. Second, whether or not the Delaware Chancery Court had the documents in front of it that Judge Carter did here, I don't even know where that is in the record, where that comes from. They had a Section 220 production in that case, too. So I'm assuming the documents were there in front of it. And let's not forget, the Delaware Supreme Court, when they reversed the Chancery Court, said to the Chancery Court, why are you assuming that the California plaintiffs were fast filers and that they did not give adequate representation? The two complaints are the same, and you just excoriated the board in yours. Third point, the Botox letters. We make very clear in our briefing that the letters from the FDA were about Botox cosmetic. But we also make very clear that Botox cosmetic and Botox therapeutic were one and the same, the very same substance. And as this case had said in the America West opinion a couple of years ago in a different securities context, it would be, I think the word was absurd for the board of the airlines in that case not to know about these warnings coming from the FAA regarding fines, etc., for plane maintenance. Same thing here. If I'm a board member and I see five letters, six letters, sorry, the sixth letter referred to five earlier letters, complaining about the promotion of the Botox material, I might want to take a little closer look at my Botox therapeutic as well. And finally, the Dr. Shim incident. Again, opposing counsel insists on calling this one incident. It wasn't one incident. It was one of eight in that one year. And yes, some people get their hands, their wrists slapped after. Dr. Shim didn't. Dr. Shim stayed on Allergan's payroll. Two years later, he wrote another article touting the benefits of Allergan therapeutic for migraine headache. And after that, he became one of Allergan's highest paid doctors, at least for a period of time. And as the Department of Justice pointed out, after the Shim, they didn't make the connection with Shim. I am. But in 2007, 2011, the board issued another strategic plan, which the Department of Justice said was, quote, the clearest connection, end quote, between ramping up this sales force and the off-label marketing of Botox therapeutic. I see I'm running into my red time here. I just have one question on it, because this is a complicated area. And the standard, I think, is high. Yes, it is. That you have to allege particularized facts that they acted with Cyanter. What's your best example of that? Which of all of these examples? Boy, there are so many. Well, just give me your best one. I like the fact that the headache development program, when it came in front of seven of our 12 directors, OK, we've got a disinterested majority. The 2003 headache development program, they knew, number one, that Allergan had failed nine of its 10 clinical trials for headache. I don't care about being optimistic about things five years down the road. They knew at that point they had failed nine out of 10. But they also knew there is a slide in the board material saying that our core team to go out there and push this stuff, one of our four core team members is one of our marketing guys. I think that's a strong indication of outright knowledge, if not at least recklessness. Thank you, Your Honors. Thank you, counsel. The case just argued will be submitted.
judges: REINHARDT, NOONAN, MURGUIA